```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                   MIDDLE DISTRICT OF PENNSYLVANIA

DAWN M. SCHLAGLE,                :
                                 :
        Plaintiff                :    No. 4:11-CV-00362
                                 :
    vs.                          :    (Complaint Filed 2/24/11)
                                 :
MICHAEL ASTRUE,                  :
COMMISSIONER OF SOCIAL           :    (Judge Munley)
SOCIAL SECURITY,                 :
                                 :
        Defendant                :
```

**MEMORANDUM**

**Background**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Dawn M. Schlagle's claim for social security disability insurance benefits and supplemental security income benefits. For the reasons set forth below we will affirm the decision of the Commissioner denying Schlagle's applications for disability insurance benefits and supplemental security income benefits.

On January 7, 2008, Schlagle filed protectively[1] an application for disability insurance benefits and an application

---

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

for supplemental security income benefits. Tr. 50, 87-93 and 109.[2] On July 17, 2008, the Bureau of Disability Determination[3] denied Schlagle's applications. Tr. 52-60.  On August 28, 2008, Schlagle requested a hearing before an administrative law judge. Tr. 61. After about 11 months had passed, a hearing before an administrative law judge was held on November 18, 2009. Tr. 25-48. On January 20, 2010, the administrative law judge issued a decision denying Schlagle's applications. Tr. 13-20.  On March 5, 2010, Schlagle requested that the Appeals Council review the administrative law judge's decision and on January 14, 2011, the Appeals Council concluded that there was no basis upon which to grant Schlagle's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

      Schlagle then filed a complaint in this court on February 24, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 19, 2011, when

---

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on May 6, 2011.

3. The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 52 and 56.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as

Schlagle filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Schlagle met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 14-15, 98 and 109.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Schlagle was born in the United States on December 30, 1966. Tr. 19, 28, 87, 109 and 203. Schlagle has the equivalent of a high school education, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 30, 112, 117 and 230. Schlagle completed 12 years of formal education but did not graduate from high school. Tr. 230. Schlagle completed training to become a certified nursing assistant in 1997 and obtained a General Equivalency Diploma in 2007. Tr. 117. During her elementary and secondary schooling Schlagle attended regular education classes. Tr. 117.

---

an appeal." M.D.Pa. Local Rule 83.40.1.

Schlagle's past relevant employment[5] was as a certified nursing assistant which was described by a vocational expert as semi-skilled, medium work, as generally performed in the economy and very heavy work[6] as actually performed by Schlagle.[7] Tr. 44.

---

5. Past relevant employment in the present case means work performed by Schlagle during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

6. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
>
> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

Schlagle's history of employment and earnings spans 19 years. Records of the Social Security Administration reveal that Schlagle had earnings in the years 1985 ($1845.03), 1986 ($130.00), 1987 ($281.75), 1989 ($1676.14), 1990 ($6193.21), 1991 ($4547.73), 1993 ($1820.06), 1995 ($862.01), 1996 ($6912.34), 1997 ($15097.30), 1998 ($12327.80), 1999 ($10331.30), 2000 ($17572.50), 2001 ($27297.56), 2002 ($26843.47), 2003 ($17696.37), 2004 ($17590.47), and 2005 ($13810.75). Tr. 99. Schlagle's total earnings were $182,843.53. Id.  Schlagle has not worked since September 6, 2005. Tr. 31.

Schlagle claims that she became disabled on September 13, 2007,[8] because of degenerative disc disease, low back pain and

---

> (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.
>
> (e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

7. Schlagle also appears to have non-relevant employment as a cashier and waitress. Tr.  70.

8. Schlagle was 40 years of age on the alleged disability onset date and 42 years of age at the time of the administrative law judge's hearing held on November 18, 2009.  Schlagle is considered a "younger individual" whose age would not seriously impact her ability to adjust to other work.  20 C.F.R. §§

5

depression. Tr. 112. She also contends that she cannot sit or stand for very long and that the medications which she takes make her drowsy. Id. The impetus for the alleged disabling impairments was a work injury sustained on August 28, 2005. Tr. 113. Schlagle testified during the administrative proceedings that she received worker's compensation benefits for that alleged work injury up until May of 2007. Tr. 31.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact

---

404.1563(c) and 416.963(c).

by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488

(1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual

lives or in several regions of the country. 42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments

---

9. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**DISCUSSION**

The administrative law judge at step one of the sequential

---

11. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

evaluation process found that Schlagle had not engaged in substantial gainful work activity since September 13, 2007, the alleged disability onset date. Tr. 15. The administrative law judge noted that "[a] printout of [Schlagle's] earnings record shows that her last reported wages were in calendar year 2005 in the amount of $13,810.75 . . . and the claimant's hearing testimony revealed that she has not worked since [that] time." Id.

At step two of the sequential evaluation process, the administrative law judge found that Schlagle had the following severe impairments: "chronic back pain, degenerative disc disease in her lumbar spine[13] and depressive disorder not otherwise specified." Tr.

---

13. A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. The vertebral body is the largest part of the vertebra and is somewhat oval shaped. The pedicles are two short processes made of bone that protrude from the back of the vertebral body. The laminae are two broad plates extending dorsally and medially from the pedicles and fusing to complete the vertebral arch (which is the posterior portion of the vertebra) and encloses the spinal cord. On an axial view of the vertebra, the transverse processes are two somewhat wing-like structures that extend on both sides of the vertebral body from the point where the laminae join the pedicles. The transverse processes serve for the attachment of ligaments and muscles. The endplates are the top and bottom portions of a vertebral body that come in direct contact with the intervertebral discs.
    Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs. The intervertebral discs, the soft cushions between the 24 bony vertebral bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge (protrusion) is where the annulus of the disc extends beyond the perimeter of the vertebral bodies. A herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus

---

and presses the annulus outward or ruptures the annulus. Such bulges(protrusions) and herniations if they contact nerve tissue can cause pain. Degenerative disc disease (discogenic disease) has been described as follows:

> As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. . . Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative disc disease.
>
> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more susceptible to herniation. Degeneration of the disc can cause local pain in the affected area. Any level of the spine can be affected by disc degeneration. When disc degeneration affects the spine of the neck, it is referred to as cervical disc disease. When the mid-back is affected, the condition is referred to as thoracic disc disease. Disc degeneration that affects the lumbar spine can cause chronic low back pain (referred to as lumbago) or irritation of a spinal nerve to cause pain radiating down the leg (sciatica). Lumbago causes pain localized to the low back and is common in older people. Degenerative arthritis (osteoarthritis) of the facet joints is also a cause of localized lumbar pain that can be detected with plain x-ray testing is also a cause of localized lumbar pain. The pain from degenerative disc disease of the spine is usually treated conservatively with intermittent heat, rest, rehabilitative exercises, and medications to relieve pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and

16.

At step three of the sequential evaluation process the administrative law judge found that Schlagle's impairments did not individually or in combination meet or equal a listed impairment. Id.

At step four of the sequential evaluation process the administrative law judge found that Schlagle could not perform her prior relevant work as a certified nursing assistant but that she had the "residual functional capacity to lift up to 10 pounds, stand and walk 4 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday. She may occasionally use ramps and climb stairs but should never climb ladders, ropes or scaffolds. She could occasionally balance, stoop, kneel, crouch and crawl.  She must avoid concentrated exposure to extreme cold, humidity, vibration, fumes, odors, dust, gases, poor ventilation, hazardous machinery and unprotected heights.  She is limited to occupations requiring no more than simple, routine, repetitive tasks not performed in a fast-paced production environment and involving only simple, work-related decision[s], and in general relatively few workplace changes." Tr. 16-19.  In setting this residual functional capacity, the administrative law judge relied on the opinion of Elizabeth Kamenar, M.D., who reviewed Schlagle's medical records on behalf of the Bureau

---

Sciatica, MedicineNet.com, http://www.medicinenet. com/degenerativedisc/page2.htm (Last accessed March 14, 2012). Degenerative disc disease is considered part of the normal aging process. Id.

of Disability Determination. Tr. 192-198. Dr. Kamenar concluded that Schlagle had the physical exertional abilities to engage in a limited range of light work consistent with the administrative law judge's determination.[14] Id.

The administrative record in this case is 381 pages in length, primarily consisting of medical and vocational records. Schlagle argues that the administrative law judge failed to properly evaluate the medical evidence and her subjective complaints.

We have thoroughly reviewed the record in this case and find no merit in Schlagle's arguments. The administrative law judge did an adequate job of reviewing Schlagle's vocational history and medical records in his decision. Tr. 13-20. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 7, Brief of Defendant. Because the administrative law judge adequately reviewed the medical evidence in his decision we will only comment on a few items.

Initially we will note that the administrative law judge rejected the opinions of Raymond J. Kraynak, D.O., and Mahmood Nasir,

---

14. The administrative law judge actually imposed additional limitations/requirements which Dr. Kamenar did not find necessary. The administrative law judge found that Schlagle could only perform a limited range of sedentary work. This was appropriate in light of the regulation which state that if a individual can perform light work he or she also can perform sedentary work. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

M.D., Schlagle's treating physicians. The opinions of those two physicians support a finding of total disability. However, we are satisfied that the administrative law judge gave an adequate explanation for rejecting the opinions of the treating physicians. From our review of the administrative record there is a total lack of objective radiological and electrodiagnostic medical findings supporting the treating physicians' opinions.

Schlagle alleged that she suffered a work-related injury to her low back on August 28, 2005. Tr. 172.  At the time of the incident Schlagle was living and working as a certified nursing assistant in the state of Ohio.  After this incident, Schlagle on September 7, 2005, commenced chiropractic treatment with Maziar Nejadfard, D.C., located in Vermilion, Ohio. Tr. 374.  Subsequently, Schlagle had an MRI of the lumbar spine performed on October 18, 2005. Tr. 290 and 374. The MRI revealed the following: "The anatomic alignment of the vertebral bodies is normal. The vertebral body heights and marrow signal are normal.  There are no findings that suggest an occult fracture.  There is no anterior, extradural[15] defect that causes significant central canal, lateral recess or neural foramen impingement." Tr. 290-291 and 332.  The MRI was interpreted by Joseph A. Schoenberger, M.D., a radiologist. Id.

---

15. Extradural is defined as "situated or occurring outside the dura mater." Dorland's Illustrated Medical Dictionary, 598 (27th Ed. 1988). The dura mater is defined as "the outer most, toughest, and most fibrous of the three membranes (meninges) covering the brain and spinal cord[.]" Id. at 514.

For some reason in or about June, 2006, Dr. Schoenberger was asked to review the MRI again by either Dr. Nejadfard or Joseph Carter, one of Schlagle's primary care physician, located in Breckville, Ohio. Tr. 290.  Schlagle moved to Pennsylvania in or about June, 2006.  As a result of reviewing the MRI scan a second time, Dr. Schoenberger was more blunt in his interpretation of the MRI. Id.  He stated as follows: "At the request of the referring clinician, examination was reviewed again.  The lumbar spine MRI is unremarkable, though there may be very early minimal loss of T2 signal in the L4-5 intervertebral disc.[16]  However, <u>no disc protrusions, bulges or herniations are evident</u>." Id. (Emphasis added.)

On September 12, 2006, Schlagle had a second MRI of the lumbar spine performed at the request of Dr. Kraynak. Tr. 163. The findings of that MRI were as follows: "There is partial dessication of the L4-5 disc without narrowing of the disc.[17] There is subtle disc bulging. There is probably some very subtle disc bulging in the T12-

---

16. "[M]inimal loss of T2 signal" suggests disc dessication. See, footnote 17, *infra*; MRI of the Spine, Duke Orthopaedics, Wheeless' Textbook of Orthopaedics, http://www.wheelessonline.com/ortho/mri_of_the_spine (Last accessed March 15, 2012).

17.  Disc dessication is when there is loss of water content or moisture in the discs, i.e., a dehydration of the discs.  When the discs dehydrate they become rigid and are more susceptible to injury, including tears in the annulus and disc herniation. Dehydration also can cause a narrowing (a decrease in height) of the discs

L1 and L1-2 discs as well. No deformity of the conus is seen.[18] No compromise of the spinal canal or neural foramen is identified. No disc protrusions or extrusions are seen. The sagittal images do suggest a mild scoliosis."[19] Id.

Dr. Kraynak referred Schlagle to Maria L. Vivino, M.D., for a second opinion regarding Schlagle's low back pain. Tr. 175. On March 3, 2007, Schlagle told Dr. Vivino that on the date of the work injury she was "standing by [a] nursing home resident with her knees slightly bent when the resident suddenly aimed a punch towards her left breast. To avoid the intended punch, she shifted her trunk to the right, As soon as she did the latter maneuver, she immediately experienced a pull over the right side of her lower back and subsequently a constant sharp burning pain[.]" Tr. 175. Dr. Vivino in the report of her examination of Schlagle stated that electromyography and nerve conduction velocity (EMG/NCV) studies performed in October, 2006, were unremarkable. Tr. 176. After conducting a physical examination of Schlagle, Dr. Vivino's impression was that Schlagle suffered from chronic low back pain radiating to the lower extremity of an unknown etiology but likely musculoskeletal; bilateral sacroiliitis; she could not rule out

---

18. The "conus medullaris" is "the cone-shaped lower end of the spinal cord, at the level of the upper lumbar vertebrae[.]" Dorland's Illustrated Medical Dictionary, 378 (27th Ed. 1988).

19. Scoliosis is defined as "an appreciable lateral deviation in the normally straight vertical line of the spine." Dorland's Illustrated Medical Dictionary, 1497 (27th Ed. 1988).

17

sciatica; right lower extremity paresthesia in the L5-S1 distribution but with no evidence of lumbosacral radiculopathy on EMG/NCV studies; and intermittent bowel and bladder incontinence of unknown etiology. Tr. 178.

In a letter dated September 17, 2008, to Schlagle's attorney, Dr. Nasir stated as follows: "The MRI of the lumbar spine reveals a partial desiccation of the L4-L5 disc with subtle disc bulging.  She also has disc bulging at T12-L1 and L1-L2. Her lower EMG was normal. Her treatment consists of [by mouth] narcotic analgesia and intermittent paravertebral facet joint nerve blocks, which result in pain relief. She is seen in the office every eight weeks to three months for evaluation. She is currently taking Neurontin, Dilaudid and Lidoderm Patch for her chronic back pain." Tr. 274. Dr. Nasir as previously stated was of the opinion that Schlagle was totally disabled. Id.

The record reveals that Dr. Kraynak treated Schlagle with narcotic pain medications and that Dr. Nasir administered numerous epidural steroid injections.  There is no indication that either physician recommended more invasive treatment, such as lumbar back surgery.

The opinions of the treating physicians appear to be primarily based on Schlagle's subjective complaints. There were some positive straight leg raise tests. However, as noted radiographs did not confirm any disc herniations or neural foraminal narrowing.

In finding that Schlagle was not disabled, the administrative law judge as stated above relied on the opinions of the state agency psychologist and the state agency physician, who reviewed Schlagle's medical records. The administrative law judge's reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., __ F.3d. __, 2011 WL 6062067 at *4 (3d Cir. Dec. 7. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The administrative law judge appropriately took into account Schlagle's physical and mental limitations in the residual functional capacity assessment.

The administrative law judge observed Schlagle testify and determined that her statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, sedentary work. Tr. 18. The administrative law judge was not required to accept Schlagle's claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and

deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." <u>Walters v. Commissioner of Social Sec.</u>, 127 f.3d 525, 531 (6th Cir. 1997); <u>see</u> <u>also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Schlagle when she testified at the hearing on November 18, 2009, the administrative law judge is the one best suited to assess the credibility of Schlagle.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/ James M. Munley<br>
JAMES M. MUNLEY<br>
United States District Judge

Dated: March 16, 2012